UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JIMMY R. KING,<br><br>　　　　Plaintiff,<br><br>v.<br><br>C/O JENNINGS, et al.,<br><br>　　　　Defendants. | Case No. 3:16-cv-2482<br><br>Judge Terence G. Berg<br>Magistrate Judge Newbern |

To:　　The Honorable Terrence G. Berg, Visiting District Judge

**<u>REPORT AND RECOMMENDATION</u>**

　　　　Plaintiff Jimmy R. King alleges that, on November 4, 2015, and November 20, 2015, he was sexually assaulted and robbed by fellow South Central Correctional Facility (SCCF) inmate Chris Gordon. King reported the rape to Defendant Allen Chalk, who King alleges failed to conduct a thorough Prison Rape Elimination Act (PREA) investigation. Sometime before May 22, 2016, Defendant Jesse James ordered that King be transferred to the Trousdale Turner Correctional Center (TTCC), where Gordon had also been transferred. King alleges that Gordon sexually assaulted him again on May 22, 2016, at TTCC. (*Id.*) King further alleges that, on June 13, 2016, Defendant Edward Wilkes allowed Gordon into King's unit, where Gordon sexually assaulted him twice more.

　　　　Now pending are a motions for summary judgment filed by Defendants Chalk and James (Doc. No. 45), King (Doc. No. 50), and Defendant Wilkes (Doc. No. 72). For the reasons that follow, the undersigned Magistrate Judge recommends that the motions for summary judgment

filed by James and Chalk (Doc. No. 45) and by Wilkes (Doc. No. 72) be GRANTED, that King's

motion for summary judgment (Doc. No. 50) be DENIED, and that the case be DISMISSED.

## I.     Procedural Background

On September 12, 2016, King filed a complaint for violations of his civil rights under 42

U.S.C. § 1983 against C/O Jennings, C/O Wilkes, Corrections Corporation of America (CCA),

Internal Affairs and Prison Rape Elimination Act (PREA) Administrator Chalk, Counselor Jesse

James, Warden Pittman, Internal Affairs Officer Hall, Inmate Chris Gordon, and Officer Gonzalez.

(Doc. No. 1.) King also filed an application to proceed in forma pauperis. (Doc. No. 2.) King was

granted leave to proceed in forma pauperis and, after conducting an initial screening under the

Prison Litigation Reform Act, 28 U.S.C. §§ 1915(e)(2), 1915A, and 42 U.S.C. § 1997e(c), the

Court ordered service of the complaint on Defendants Chalk, James, and Wilkes; dismissed

Defendants Gordon, Jennings, Gonzalez, Pittman, Hall, and all claims brought against the

defendants in their official capacities; and referred this action to the undersigned Magistrate Judge

for case management and a report and recommendation on all dispositive motions. (Doc. No. 3.)

Before any of the defendants were served, King filed an amended complaint (Doc. No. 6),

repeating the allegations in his original complaint and clarifying that he intended to sue Wilkes,

Chalk, and James in their individual capacities. King effected service on the remaining defendants,

(Doc. Nos. 17, 18, 65), who answered the amended complaint (Doc. Nos. 24, 62).[1]

On September 12, 2017, Chalk and James filed a motion for summary judgment and

statement of undisputed material facts. (Doc. Nos. 45, 47.) In response, King filed a document

---

[1]      Chalk and James were served in November, 2016 and filed a single answer. (Doc. Nos. 17, 18, 24.) Wilkes, who was not served until November 2017 because of difficulty obtaining his last known address, answered separately (Doc. No. 62). All defendants are represented by the same counsel.

styled "Plaintiff's Response and Motion for Summary Judgement (Rule 56) in Support." (Doc. No. 50.) King also filed a statement of facts in support of his motion for summary judgment. (Doc. No. 52.) As his substantive response to Chalk and James's motion, King filed a declaration to which he attached his response to their statement of undisputed material facts. (Doc. No. 51.) Chalk and James filed a response in opposition to King's motion for summary judgment and a reply to King's opposition to their motion. (Doc. No. 55.) They also filed a response to King's statement of facts. (Doc. No. 56.) King filed a document styled "optional response," which appears to be his reply to Chalk and James's opposition to his motion for summary judgment. (Doc. No. 57.)

On March 15, 2018, Wilkes filed a separate motion for summary judgment and statement of undisputed material facts. (Doc. Nos. 73, 74.) King filed a document styled "Response to Requested Defendants Summary Judgment /and Declaration of Jimmy R. King 310471" which appears to be King's opposition to Wilkes's motion. (Doc. No. 80.) King did not file a response to Wilkes's statement of undisputed material facts.

## II.    Statement of Facts

King's claims against Chalk and James relate to incidents that took place at the South Central Correctional Facility (SCCF), where they were employed at the time of the events in question. King's claims against Wilkes relate to incidents at the Turney Trousdale Correctional Center (TTCC), where Wilkes was temporarily assigned.

In his complaint and amended complaint, King alleges that, on November 4, 2015, and November 20, 2015, while he was housed at SCCF, Gordon sexually assaulted and robbed him. (Doc. No. 1, PageID# 61; Doc. No. 6, PageID# 29.) King reported the rape to "PREA Internal Affairs, but states that Chalk "did not thoroughly investigate [or] report [on his investigation]." (*Id.*) Sometime before May 22, 2016, James ordered that King be transferred to TTCC "even

though [Gordon] was previously sent there." (*Id.*) On May 22, 2016, Gordon sexually assaulted King. (*Id.*) On June 13, 2016, Wilkes allowed Gordon into King's unit and into King's cell, where he sexually assaulted King at around 9:00 a.m. and 7:00 p.m. (*Id.*) King states that he was taken to the hospital and given treatment to prevent sexually transmitted diseases. (*Id.*) King alleges that, after Gordon was released from segregation, he was again allowed into King's unit on June 23, 2016, and threatened King. (*Id.* at PageID# 7.) King states that he provided biological evidence of the assaults to prison officials. (*Id.*)

Finally, King alleges that, on September 6, 2016, an officer who is not a defendant to this action allowed Gordon into the pod in which King was housed, placing King in danger. (*Id.* at PageID# 11.) King filed an emergency grievance regarding this incident, which he includes in his original complaint. (*Id.* at PageID# 9–10.) King requests a money damages award for his claims. (*Id.* at PageID# 12.)

## A. The SCCF Incidents[2]

At all relevant times, Chalk was "a mental health support advocate" at SCCF. (Doc. No. 45-1, PageID# 157, ¶ 2.) Chalk states that this position entails evaluating the mental health of inmates and, in particular, evaluating the mental health of inmates who allege that they have been sexually assaulted or abused to determine whether they need continuing mental health care. (*Id.* at ¶¶ 3, 4.) Chalk states that he is "not in any way involved in investigating PREA allegations or determining whether an inmate's allegations are substantiated." (*Id.* at ¶ 5.) Chalk does not recall King, but states that he knows that he did not conduct an investigation into King's allegation that he was assaulted by Gordon because he "do[es] not conduct or participate in such investigations."

---

[2]     These facts are drawn from the declarations James and Chalk filed in support of their statement of undisputed facts. To the extent King materially disputes any of the facts set out by the declarants, that dispute is noted.

(*Id.* at ¶ 7.) Chalk states that he "do[es] not make any decision concerning the transfer of inmates from one facility to another facility." (*Id.* at ¶ 8.)

James states that, at all relevant times, he was a "case manager for segregation" at SCCF and served as a counselor to inmates housed in segregation, including inmates in protective custody and close custody. (Doc. No. 45-2, PageID#160, ¶ 3.) In this role, James was the person segregation inmates could contact if they had any issues or complaints. (*Id.*) James was not involved in PREA investigations and, if an inmate reported that he was sexually assaulted or abused, James would report this information to his supervisor. (*Id.* at ¶ 4.) James states that he did not make decisions regarding the transfer of inmates between facilities. (*Id.* at ¶ 6.)

After reviewing King's records on the Tennessee Offender Management Information System (TOMIS), a computerized database used to maintain information about Tennessee Department of Corrections (TDOC) inmates, James noted that, on November 20, 2015, King was placed in protective custody and housed in administrative segregation. (*Id.* at ¶¶ 8, 9.) King never told James why he was in protective custody or that another inmate had assaulted him. (*Id.* at ¶¶ 10, 11.) James states that when an inmate made a complaint to him, he would create a "contact note" in TOMIS. (*Id.* at ¶ 12.) James states that "there are no contact notes entered between November 2015 and May 2016 from me concerning [King] making any complaint or comment" about sexual assault or his wish not to be transferred to the same facility as Gordon. (*Id.*) James states that, had King informed him that King did not want to be transferred to a facility that housed Gordon, James would have created a contact note and would have contacted the prison's Classification Coordinator about King's concerns. (*Id.* at ¶ 13.)

In his response in opposition to Chalk and James's motion, King states that James asked him about being transferred to TTCC and that King responded that he would need to make sure

that Gordon was not housed there. (Doc. No. 51, PageID# 219, ¶ 6.) King also states that James "could have stopped the transfer after I informed him of Chris Gordon. He came and asked me if I wanted to go to TTCC." (*Id.* at PageID# 229, ¶ 22.)

Eric Bryant, Assistant Warden at SCCF, submitted a declaration in support of Chalk and James's motion in which he explains the prison's PREA investigation process. (Doc. No. 45-3.) Bryant states that he is "responsible for reviewing and approving or disapproving the findings of some PREA investigations after they are concluded." (*Id.*) Bryant states that all PREA investigations conducted at SCCF are thoroughly documented that there are contemporaneous PREA investigation records concerning King's allegations against Gordon. (Doc. No. 45-3, PageID# 165-66, ¶¶ 2, 3, 4.) These records show that, on November 20, 2015, King stated that Gordon had forced him to perform oral sex and requested protective custody. King "immediately" underwent a complete medical evaluation to discover signs of sexual assault, but none were found. King was then placed in protective custody and a full investigation was conducted. (*Id.* at ¶¶ 5, 6, 7, 8.)

Bryant states that SCCF staff interviewed King and interviewed Gordon, who "adamantly denied [King's] allegations." (Doc. No. 45-3, PageID# 166, ¶¶ 9, 10, 12.) Bryant notes that Gordon resided in a different unit than King and was never assigned to the same unit as King while housed at SCCF. (*Id.* at ¶ 11.) Bryant states that, in addition to interviewing King and Gordon, SCCF staff reviewed video footage, recorded telephone calls involving King and Gordon, and both men's inmate histories.[3] (*Id.* at ¶ 8.) The PREA investigators "fully documented their investigation." (*Id.*)

---

[3]     King makes much of Bryant's statement that the PREA investigators viewed video footage as part of their investigation. (Doc. No. 51, PageID# 226, ¶ 9, 10, 11.) According to King, he was told by Defendants' counsel that no video footage existed. (*Id.*) However, a March 3, 2017 letter submitted Defendants shows that counsel told King in connection with King's informal request for discovery that "no security footage exists from November 4, 2015 or November 20, 2015. Any

Based on his review of the investigation file, Bryant agreed with and approved the conclusion that King's allegations were unsubstantiated. (*Id.* at ¶¶ 13, 14.) Nevertheless, King was put on permanent protective custody after SCCF staff learned that he had been threatened by other inmates to whom he owed a commissary debt. (*Id.* at PageID# 167, ¶¶ 16, 17.) Bryant states that neither Chalk nor James "had any involvement whatsoever in investigating King's PREA allegations."[4] (*Id.* at ¶ 15.)

King does not dispute that a medical examination was performed at SCCF and found no signs of sexual assault. He argues, instead, that the examination was insufficient and that he should have been taken to a hospital for a medical examination and testing for sexually transmitted diseases. (Doc. No. 51, PageID# 225, ¶¶ 6, 7.) King also does not dispute that SCCF staff conducted a PREA investigation and concluded that his allegations were unsubstantiated, but again contends that the investigation was not thorough. (*Id.* at PageID# 226, ¶ 12.) King also asserts that Chalk was involved in the PREA investigation because he took statements from King and Gordon, placed them both on segregation, and told King that if he remembered anything more about the incident to contact him. (*Id.* at PageID# 220.)

Chalk and James also offer a declaration from Lee Brewer, the Classification Coordinator at SCCF. (Doc. No. 45-5.) Brewer states states that, because SCCF does not permanent protective custody housing, inmates who are designated for protective custody are placed in segregation until they can be transferred to another facility. (Doc. No. 45-5, PageID# 185, ¶ 6.) Brewer states that

---

such footage was looped over long ago and SCCF no longer has access to any such footage." (Doc. No. 65-1, PageID# 273.) These statements are not inconsistent. Taken together, they establish that video footage existed, but had been recorded over at the time of King's request.

[4] King disputes this statement on grounds that Chalk was involved in the commissary incident, but provides no explanation as to how the commissary issue and PREA investigation may be linked.

an inmate cannot be transferred to a facility that houses an inmate who is on his "incompatible list." (*Id.* at PageID# 186, ¶ 12.) Brewer states that, where there has been a substantiated claim of sexual assault, the accused and the accuser would be identified as incompatible on TOMIS. (*Id.* at ¶ 19.)

An SCCF protective custody inmate can be transferred to a facility where "the inmate does not have any incompatibles listed on TOMIS . . . and the new facility provides the appropriate level of mental health care." (*Id.* at ¶ 10) Brewer had the authority to coordinate a transfer, but the Warden and TDOC Contract Monitor must approve or disapprove a transfer before it can take place. (*Id.* at ¶ 11.) Brewer states that King had been in protective custody at SCCF for nearly six months before Brewer found a potential placement for King at TTCC. (*Id.* at PageID# 186, ¶ 14.) After he confirmed that King did not have any incompatibles listed on TOMIS who were housed at TTCC and obtained the necessary approval, Brewer transferred King to TTCC on May 13, 2016. (*Id.* at ¶ 16.) Brewer states that "case managers, like Jesse James, had and have no control or authority to approve or disapprove a transfer." (*Id.*)

Brewer states that King never told him that an inmate housed at TTCC had sexually assaulted him, nor did anyone else tell Brewer about King's allegations. (*Id.* at ¶ 18.) Nevertheless, Brewer explains that inmates "often come up with numerous different complaints and reasons why they may not want to transfer to a different facility. However, many times these complaints are not legitimate reasons to forbid transfer." (*Id.* at ¶ 20.) For this reason, Brewer states that, even if King had told Brewer he had been sexually assaulted by another inmate, Brewer would have determined whether a PREA investigation substantiated King's concerns. (*Id.* at ¶ 21.) If the results of the investigation established that there was no evidence to support King's sexual assault allegations, Brewer would have transferred King to TTCC. (*Id.* at PageID# 186–87, ¶¶ 18, 19, 20, 21.)

King states that Gordon "should have been listed as an incompatible" because "for 6 months [he] made it clear not to send [him] anywhere Chris Gordon was," but he does not dispute that Gordon was not on his incompatible list when he was transferred to TTCC. (Doc. No. 51, PageID# 228, ¶ 21.) Additionally, King affirms that he and Brewer never spoke. (*Id.* at PageID# 219.)

## B. The TTCC Incidents[5]

King was transferred to TTCC on May 13, 2016. Wilkes states that, starting in June 2016, he was working as a corrections officer on temporary assignment at TTCC. (Doc. No. 72-1, PageID# 374–75, ¶¶ 3, 4, 5.) TTCC rules and regulations prohibit inmates from leaving the unit to which they are assigned, but, when the facility is not on lockdown, inmates in most units are free to move in and out of their cells and to walk around the common area of their pod. (*Id.* at PageID# 375, ¶¶ 6, 7.) Wilkes states that he never knowingly allowed an inmate to go into a unit to which that inmate was not assigned. (*Id.* at ¶ 9.) Were Wilkes to find an inmate out of place, he would issue a "disciplinary" against that inmate and have the inmate immediately taken back to his assigned unit. (*Id.*) Wilkes states that he never allowed Gordon to be in a unit where he was not assigned or in King's cell. (*Id.* at ¶¶ 10, 11, 12.)

Wilkes states that he does not recall ever speaking to King or King ever letting him know that he had a "bad history" with Gordon. (*Id.* at PageID# 375-76, ¶¶ 13, 14.) Wilkes states that King never asked Wilkes to place Gordon on his incompatible list, requested protective custody, or told Wilkes that he feared Gordon would assault him. (*Id.* at PageID# 376, ¶¶ 15, 16, 17.) Wilkes

---

[5]    Because King did not file a response to Wilkes's statement of undisputed material facts, the facts contained therein are deemed to be undisputed. M.D. Tenn. R. 56.01(f) (failure to respond). Nevertheless, construing King's pleadings liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), to the extent that King's response to Wilkes's motion addresses any of the undisputed facts raised by Wilkes, the Court will consider his arguments and any evidence to which he refers.

explains that, had King done any of these things, Wilkes would have taken immediate steps to ensure King's safety and would have reported King's concerns to his supervisor. (*Id.* at ¶ 18.) Wilkes states that he only learned of King's allegations when he was named in this lawsuit. (*Id.* at ¶ 20.)

Brian Mendenhall, the Facility Investigator at TTCC, submitted a declaration in support of Wilkes's motion. (Doc. No. 72-3.) Mendenhall is responsible for investigating reports from inmates that they have been sexually assaulted and inmate requests for protective custody. (*Id.* at PageID# 384, ¶ 3.) On June 13, 2016, King was assigned to the C pod of the Charlie Unit at TTCC. (*Id.* at PageID# 385, ¶ 14.) On June 14, 2016, King told Mendenhall that Gordon forced King to perform oral sex on him three times between May 15, 2016, and June 13, 2016. (*Id.* at PageID# 386, ¶ 13.) Mendenhall states that, before June 14, 2016, King and Gordon were not listed as incompatibles on TOMIS, King had not requested that Gordon be placed on his incompatible list, and King had not asked for any protective services. (*Id.* at PageID# 385–86, ¶¶ 9, 10, 11, 12.) Mendenhall states that, had King told him or any other TTCC corrections officer that Gordon should be on his incompatible list, an investigation would have been conducted and protective services would have been provided, if necessary. (*Id.* at PageID# 385, ¶ 10.)

After King told Mendenhall about Gordon's sexual assault, King was "immediately" given a medical evaluation to determine if there were any physical signs of sexual assault; none were found. (*Id.* at PageID# 386, ¶ 16.) Mendenhall conducted an investigation, interviewing King and Gordon, reviewing video footage, and attempting to identify any witnesses to the claimed incidents. (*Id.* at ¶ 17.) During his interview, King told Mendenhall that, on June 13, 2016, Gordon forced him to perform oral sex for about "10 minutes" at approximately 9:00 a.m. and for about "10 to 15 minutes" at approximately 7:00 p.m. (*Id.* at ¶ 18.) Gordon denied King's allegations and

told Mendenhall that King owed him money for drugs. (*Id.* at ¶ 19.) Gordon also told Mendenhall that King owed several inmates money and that he had filed "bogus" PREA claims to avoid paying his debts. (*Id.* at PageID# 387, ¶ 19.) Gordon claimed that he came to King's cell to give King part of a strip of Suboxone to "get him through the day" because King was sick from drug withdrawal. (*Id.*) Gordon told Mendenhall that he went back to King's cell later in the day to ask King for payment. (*Id.*)

Mendenhall reviewed video footage of the pod where King was housed from June 13, 2016. (*Id.* at PageID# 386–87, ¶¶ 14, ¶ 20.) The video footage confirmed that Gordon entered King's cell twice on June 13, 2016, but also showed inconsistencies with King's allegations and appeared to support Gordon's statement that he and King were involved in a drug transaction. (*Id.* at ¶ 21.) Mendenhall states that the video footage showed the following: Gordon entered King's cell at 8:58 a.m.; six minutes later, he opened King's cell door and left to meet with another inmate; what appears to be a drug transaction took place between Gordon and the other inmate at the top of the stairs to the pod; Gordon returned to King's cell at 9:06 a.m. and exited less than a minute later. (*Id.* at ¶ 22.) The video also showed that Gordon returned to King's cell at 6:56 p.m. A minute later, King opened his cell door, exited his cell, and dropped an unknown item off the upper tier of the pod to an inmate standing below. (*Id.* at ¶ 23.) At 6:58 p.m., Gordon and King exited the cell together and proceeded to the dayroom. (*Id.*) Mendenhall states that King did not appear to be in distress, and King and Gordon "appeared to be cooperating with each other." (*Id.*)

Because Mendenhall believed that the video footage showed multiple drug transactions, and because Gordon told Mendenhall that King's issue with him was related to drugs, Mendenhall ordered Gordon and King to submit urinalysis tests. Both men's tests were positive for illegal

drugs, and King's was positive for Suboxone (*Id.* at ¶ 25.) King was issued a disciplinary charge for the positive drug screen, to which he pleaded guilty. (*Id.* at ¶ 26.)

Mendenhall states that, based on his investigation, he found King's allegations against Gordon to be unsubstantiated. (*Id.* at ¶ 28.) Mendenhall also states that "[a]t no time did [King] ever report to me that he informed . . . Wilkes that he feared for his safety due to . . . Gordon. During the PREA investigation, [King] never identified . . . Wilkes as a witness or as someone who had any knowledge of the events. In fact, King never even mentioned his name or identified any officers that he believed should or could have prevented the alleged assault." (*Id.* at ¶ 28.)

## C. Administrative Grievances

Leigh Staggs, SCCF Grievance Chairperson, states by declaration that SCCF follows the TDOC policy regarding submission of written complaints by inmates. (Doc. No. 45-4, PageID# 169–70, ¶ 5.) Under this policy, SCCF inmates may submit written grievances "concerning the substance or application of a written or unwritten policy or practice, any single behavior or action toward an inmate by staff or other inmates, or any condition or incident within SCCF which personally affects the inmate." (*Id.*) Inmates are informed of the grievance process in the inmate handbook, which all inmates receive upon arrival at SCCF. (*Id.* at PageID# 170, ¶ 6.) Grievances must be submitted within seven calendar days of the event giving rise to the grievance. (*Id.* at ¶ 7.) Grievances filed after more than seven days are dismissed as untimely. (*Id.*)

The grievance process has three levels of review. (*Id.* at ¶ 8.) Grievances are first reviewed by a Grievance Chairperson, who issues a response that is returned to the inmate. (*Id.*) Within five days of receiving the Grievance Chairperson's response, the inmate may appeal to the Grievance Committee and Warden. (*Id.*) On appeal, the Grievance Committee holds a hearing on the inmate's grievance and issues a recommendation to the Warden. (*Id.*) After reviewing the grievance and the

Committee's recommendation, the Warden makes a decision. (*Id.*) Within five days of the Warden's decision, the inmate may appeal to the Deputy Commissioner of the TDOC, whose decision is final. (*Id.*)

The grievance process remains open to an inmate even if he is transferred from SCCF. (*Id.* at ¶ 9.) Under these circumstances, the Grievance Chairperson at the facility to which the inmate has been transferred will log the grievance and forward it to the SCCF Grievance Chairperson. (*Id.*) SCCF maintains records of all properly filed inmate grievances. (*Id.* at ¶ 11.) All inmate grievance filled at any facility in the state are recorded in TOMIS. (*Id.*)

Staggs states that she reviewed King's TOMIS records and found that he had filed three grievances while at SCCF: on December 28, 2015, for missing commissary items; on February 16, 2016, for not being able to call his mother; and on April 6, 2016, because of issues regarding his medication. Staggs found no grievance containing allegations of sexual assault or allegations against James or Chalk. (*Id.* at PageID# 171, ¶ 13, PageID# 173–83.) Staggs never received a grievance from the Grievance Chairperson at TTCC and her review of King's TOMIS records showed that King did not file any grievances while at TTCC. (*Id.* at PageID# 171, ¶¶ 14, 15.) King states that he did file a grievance, but Staggs improperly gave it to Chalk. (Doc. No. 51, PageID# 222, 230, ¶¶ 12, 25.)

Lybrunca Cockrell, acting Grievance Chairperson for TTCC, also filed a declaration in support of Wilkes's motion. (Doc. No. 72-2.) Cockrell states that, although TTCC is a privately run facility, it follows the same TDOC policy regarding written grievances in place at SCCF. (*Id.* at PageID# 380–81, ¶¶ 5, 6, 7.) Cockrell states that, like SCCF, TTCC maintains records of all inmate grievances and that all inmate grievances filed at TTCC are recorded in TOMIS. (*Id.* at PageID# 381, ¶¶ 8, 9, 10.) Cockrell states that she reviewed King's TOMIS record and found that

he "filed no grievances during his time at TTCC and never filed a grievance against . . . Wilkes." (*Id.* at PageID# 382, ¶ 11.)

### III. Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, the moving party must prove the absence of a genuine issue of material fact as to any essential element of the opposing party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 847 (6th Cir. 2016). In determining whether the moving party has met its burden, a court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stiles*, 819 F.3d at 848. A court must not weigh the evidence and determine the truth of the matters asserted but instead must determine whether there is a genuine issue for trial. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).

The absence of a triable material fact is shown if, after adequate time for discovery, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; s*ee also Nolen v. FedEx TechConnect, Inc.,* 971 F. Supp. 2d 694, 711 (W.D. Tenn. 2013) (explaining that a moving party may succeed "by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the nonmoving party's evidence to show why it does not support a judgment for the nonmoving party") (citing 10A Charles A. Wright, *et al.*, Fed. Prac. & Proc. Civ. § 2727 (2d ed. 1998)). The moving party "ha[s]

the initial burden of 'showing'— that is, pointing out to the district court — that there is an absence of evidence to support [the nonmoving party's] case." *Peterson v. Johnson,* 714 F.3d 905, 910 (6th Cir. 2013) (quoting *Celotex,* 477 U.S. at 325). If the moving party does so, the burden shifts to the nonmoving party "to 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex,* 477 U.S. at 324).

To meet its burden, the nonmoving party must go beyond the pleadings and present specific facts demonstrating the existence of a genuine issue for trial. *Shreve v. Franklin Cty.,* 743 F.3d 126, 132 (6th Cir. 2014). "A mere scintilla of evidence by the nonmoving party is insufficient to defeat summary judgment; 'there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *St. Clair Marine Salvage, Inc. v. Bulgarelli*, 796 F.3d 569, 574 n.2 (6th Cir. 2015) (alteration in original) (quoting *Anderson,* 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment may be granted. *Anderson,* 477 U.S. at 249–52. If the nonmoving party fails to make that showing, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The moving party is entitled to summary judgment.

This Court's Local Rule 56.01 requires that any motion for summary judgment be accompanied by a separate statement of the material facts to which the moving party asserts there is no genuine issue for trial. M.D. Tenn. R. 56.01(b) (statement of undisputed material facts). Any party opposing the motion must respond to each fact by agreeing that the fact is undisputed or by demonstrating that it is in dispute by specific citation of evidence in the record. M.D. Tenn. R. 56.01(c) (response to statement of facts). Failure to respond under the terms of this rule shall

indicate that the asserted fact is not disputed for purposes of summary judgment. M.D. Tenn. R. 56.01(f) (failure to respond).

## IV. Analysis

To prevail on his Section 1983 claims, King must show, first, that he was "deprived of a right secured by the Constitution or laws of the United States" and, second, that "the deprivation was caused by a person acting under color of state law." *Webb v. United States,* 789 F.3d 647, 659 (6th Cir. 2015). King that Chalk, James, and Wilkes have violated his Eighth Amendment rights through their deliberate indifference to his health and safety when they failed to protect him from inmate Gordon's repeated sexual assaults.

### A. Failure to Exhaust Administrative Remedies

Exhaustion of administrative remedies is mandatory under the Prison Litigation Reform Act (PLRA) before a claim can be pursued in court. *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. Exhaustion serves the necessary interest of providing "fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a Defendant in a prisoner's complaint." *LaFountain v. Martin*, 334 F. App'x. 738, 740 (6th Cir. 2009) (citing *Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006)). Where a complaint contains both exhausted and unexhausted claims, the court may dismiss unexhausted claims and proceed with those that have been exhausted. *See Jones*, 549 U.S. at 219–225. Failure to exhaust is an affirmative defense under the PLRA for which defendants bear the burden of proof. *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (quoting *Jones*, 549 U.S. at 216).

The PLRA requires "proper exhaustion" of a grievance. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). To properly exhaust a claim, a prisoner must take advantage "of each step the prison holds out for resolving the claim internally" and follow the "'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (quoting *Woodford*, 548 U.S. at 90). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford,* 548 U.S. at 90. Further, "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 217–18. "Generally, the transfer of a prisoner from one facility to another does not render the grievance procedures at the transferor facility unavailable for purposes of exhaustion." *Napier v. Laurel Cty.*, 636 F.3d 218, 223 (6th Cir. 2011).

Defendants offer the declarations of the Grievance Chairpersons from SCCF (Staggs) and TTCC (Cockrell) to establish that King did not file a grievance against Chalk, James, or Wilkes. (Doc. No. 45-4; Doc. No. 72-2.) Staggs states that, upon reviewing King's TOMIS records, she found three grievances, none of which concerned allegations of sexual assault or allegations against Chalk or James. (Doc. No. 45-4, PageID# 171, 173–83.) Cockrell states that King did not file any grievances while housed at TTCC and, specifically, did not file any grievances against Wilkes. (Doc. No. 72-2, PageID# 382, ¶ 11.)

In an effort to rebut the defendants' evidence, King states that he gave Staggs a grievance against Chalk and James, but that Staggs improperly gave it to Chalk instead of handling it through regular prison procedures. (Doc. No. 51, PageID# 222.) King does not point to any evidence in the record to substantiate this claim, other than his own declaration. (*Id.*) Alternatively, King states

that he was not required to file a grievance against Chalk and James. (Doc. No. 57, PageID# 275–76.) King does not dispute that he failed to file a grievance against Wilkes, but, instead, argues that he was not required to file a grievance against Wilkes at all. (Doc. No. 57, PageID# 275–76.)

To the extent that King intends to suggest that the "emergency grievance" included with his original complaint was filed in an effort to exhaust his claims against these defendants, his argument fails. That grievance was filed on September 6, 2016, well after the events that are the subject of this action. The grievance also does not show that it was filed or accepted by a grievance clerk. (Doc. No. 1, PageID# 9–10.) Finally, there is no evidence that, if the grievance was filed, it was exhausted through all three levels of the administrative review process. *See Reed-Bey*, 603 F.3d at 324 (holding that proper exhaustion requires a prisoner to take advantage "of each step the prison holds out for resolving the claim internally"); *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) (recognizing that a plaintiff must pursue all levels of the administrative procedure before filing an action in federal court.)

In the alternative, King argues that he was not required to file grievances regarding these events. (Doc. No. 57, PageID# 275–276; Doc. No. 80, PageID# 440.) King offers three pieces of evidence to support that argument: (1) an excerpt from the Corrections Corporation of America and TDOC 2016 Inmate Handbook from the Whiteville Correctional Facility (Doc. No. 57, PageID# 275; Doc. No. 57-1); (2) a TDOC pamphlet entitled "Male Inmate on Inmate Sexual Assault Orientation" (Doc. No. 57, PageID# 27; Doc. No. 57-2); and (3) a pamphlet entitled "Inmate Orientation Grievance Procedures" from the Whiteville Correctional Facility (*id.*). These materials also do not support King's argument.

First, two of the documents are from the Whiteville Correctional Facility, where King was transferred in December 2016, long after the incidents that are central to this action. (Doc. No. 23.)

King makes no argument as to why those materials would be relevant to events that took place at TTCC or SCCF. King also does not state, and there is no evidence to suggest, that he relied on them in not filing a grievance against these defendants. Indeed, given that the events at SCCF happened on November 4, 2015, King could not have relied on documents that did not exist until after the events occurred.

Nor do the documents support King's argument that he was not required to exhaust his claims. King directs the Court to a section of the Whiteville inmate manual regarding claims under Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race in the provision of government services. (Doc. No. 57-1, PageID# 285.) The handbook states that "[u]se of the TDOC grievance procedure is not a prerequisite to the pursuit of other remedies," which King interprets to mean that exhaustion is not required before bringing federal litigation. (*Id.* at PageID# 286.) But this section addresses only Title VI claims, which may, in some circumstances, fall outside the PLRA's exhaustion requirement. Further, the section states that "[o]ffenders in TDOC custody should use the established inmate grievance process." (*Id.* at PageID# 285.) The inmate orientation grievance procedures establish that a grievance procedure is available at the Whiteville facility. (Doc. No. 57-2, PageID# 326.) King focuses on a statement that seeking monetary compensation for injuries is inappropriate through the grievance procedure. But the fact that an administrative grievance procedure does not permit the award of money damages does not excuse a prisoner from exhausting his administrative remedies before filing a claim for money damages in federal court. Booth v. Churner, 532 U.S. 731, 733–740 (2001).

Finally, the TDOC male inmate on inmate sexual assault orientation materials state that, if an inmate fears sexual assault, he "may utilize the inmate grievance procedure *or* request protective custody 'PC' housing." (*Id.* at PageID# 328) (emphasis supplied). King notes that he did request

protective custody. (*Id.*) There is nothing to indicate, however, that requesting protective custody obviates the need for an inmate to follow the administrative grievance procedure if he intends to pursue litigation regarding his claims.

King has not responded with "significant probative evidence," *Napier*, 636 F.3d at 225, to create a genuine issue of material fact that he did properly exhaust the claims he brings in this action or that no administrative remedy was available to him. *Ross v. Blake*, __ U.S. __, 136 S.Ct. 1850, 1858 (2016). The defendants are therefore entitled to summary judgment on this ground.

Even if King had properly exhausted his claims, however, the defendants would still succeed on their motions.

## B. Eighth Amendment: Failure to Protect

Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, prison staff are obliged to take "reasonable measures" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). In order to establish liability under the Eighth Amendment for a prison official's failure to protect him, an inmate must demonstrate that the official was deliberately indifferent to a substantial risk of serious harm. *Farmer*, 511 U.S. at 828. A determination of deliberate indifference contains both subjective and objective components.

To satisfy the objective component, an "inmate must show that 'he is incarcerated under conditions posing a substantial risk of serious harm.'" *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 833). The subjective component requires an inmate to "show that (1) 'the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner,' (2) the official 'did in fact draw the inference,' and (3) the official 'then disregarded that risk.'" *Richko v. Wayne Cty.*, 819 F.3d 907, 916 (6th Cir. 2016) (quoting *Rouster*

*v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)). The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. It is not enough that the official should have perceived a significant risk, but did not. *Id.* An official's state of mind must be "more blameworthy than negligence" before liability will attach. *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997) (quoting *Farmer*, 511 U.S. at 835). Finally, in analyzing the subjective component, the court must consider each defendant's knowledge individually. *See Bishop*, 636 F.3d at 767 (citing *Phillips v. Roane Cty.,* 534 F.3d 531, 542 (6th Cir. 2008) and *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)).

### 1. Defendant James

In his complaint, King alleges that James violated his Eighth Amendment rights by sending him to TTCC "even though [his] rapist was previously sent there." (Doc. No. 1, PageID# 6.) By moving King to the same facility as Gordon, King argues that James put him "in great jeopardy of bodily harm and possible death." (Doc. No. 51, PageID# 219.) James argues that he was not involved in the decision to transfer King, and that, even if he had been aware that Gordon was at TTCC when King was going to be transferred there, he would not have been able to prevent King's transfer. (Doc. No. 46, PageID# 196-97.)

As an initial matter, the evidence in the record establishes that James was not involved in the process that resulted in King's transfer or in the decision to transfer King to TTCC, and King offers nothing to rebut it. *Anderson*, 477 U.S. at 248. James states in his declaration that he had no role in the decision to transfer King. (Doc. No. 45-2, PageID# 161, ¶ 5.) Brewer states that he coordinates inmate transfers and the Warden and the TDOC Contract Manager must approve a transfer before it can take place. (Doc. No. 45-5, PageID# 184, 186, ¶¶ 11–17.) Brewer confirms

that James had no role in the decision to transfer King. (*Id.* at PageID# 186, ¶11.) King does not offer even "a scintilla of evidence," *Sutherland,* 344 F.3d at 613, to demonstrate that James participated in the decision to transfer him.

Assuming that King intended to allege that James violated his Eighth Amendment rights by failing to prevent King from being transferred to TTCC, summary judgment is still appropriate. King states that, if "James would have informed the Warden of South Central Correctional Institute [sic], and classifications Mr. Lee Brewer, that Mr. King was on . . . protective custody because he feared for his safety from an inmate named: Chris Gordon," he "would not have [been] assigned . . . to the same facility in which Chris Gordon was previously assigned." (Doc. No. 51, PageID# 218–19, ¶¶ 4, 5.) However, King points to no evidence in the record to show that James knew that King was afraid of Gordon, and James states that King never told him why King was on protective custody or that another inmate had assaulted him. (Doc. No. 45-2, PageID# 161, ¶¶ 10, 11.)

Moreover, there is no evidence in the record to show that James's alleged failures were the proximate cause of King's alleged injury. *See Doe v. Sullivan County,* 956 F.2d 545, 550 (6th Cir. 1992) (holding that proximate causation is an essential element of a § 1983 claim for damages); *Wooler v. Hickman Cty.*, No. 5:05CV-247-R, 2008 WL 5412826, at *12 (W.D. Ky. Dec. 30, 2008) (recognizing that "[a] § 1983 plaintiff cannot recover unless he or she establishes a causal connection between the challenged conduct of the defendants and the harm suffered.") Brewer confirmed that King had no incompatibles at TTCC and proposed transferring King there, a proposal that was approved by the Warden and TDOC Contract Manager. (*Id.* at 186, ¶¶ 15, 16.) Brewer admits that no one told him about King's allegations against Gordon, and King concedes that he did not talk to Brewer, but Brewer makes clear that, even if he had known, King would still have been eligible for transfer to TTCC. (*Id.* at PageID# 186–87, ¶ 18, 20, 21; Doc. No. 51,

PageID# 219, ¶ 6.) Because the PREA investigation concluded that King's allegations were unsubstantiated, Gordon was not placed on King's incompatibles list and Brewer had no reason not to transfer King to TTCC. (*Id.* at PageID# 187, ¶ 21.) Finally, Brewer would have determined whether a complete PREA investigation was done and if there was any validity to King's concerns about being transferred. (*Id.* at PageID# 187 ¶ 21.) If Brewer found that the PREA investigation was "appropriately completed and showed that there was no evidence to support [King's] allegations"—the conclusion reached by the investigation—Brewer states that he would have "moved forward with the transfer." (*Id.*)

Thus, even if James should have told Brewer that King did not want to be housed with Gordon because he was fearful of being sexually assaulted, the undisputed evidence demonstrates that Brewer would still have transferred King to TTCC because Gordon was not on King's incompatible list and the PREA investigation concluded that King's allegations against Gordon were unsubstantiated. (*Id.*) There is no evidence in the record to show that James's alleged failure was the proximate cause of King's alleged injury. Summary judgment is therefore appropriate.

## 2. Defendant Chalk

King alleges that Chalk did not thoroughly investigate or report on King's PREA complaint.[6] (Doc. No. 1, PageID# 6.) Chalk states by declaration that he is the mental health support advocate at SCCF, that he does not investigate PREA complaints, and that evaluating an inmate's mental health is his only role in connection with an inmate's allegation that he has been

---

[6] While King argues that the PREA investigation was incomplete, King does not offer any evidence to suggest what the investigators should have, but did not do to make the investigation complete or, more importantly, how a more complete investigation would have altered the outcome. King cannot create a disputed issue of fact merely by disputing a fact. He must, but has not, "produce[d] evidence sufficient to require submission of the issue to the jury." *Lucas v. Leaseway Multi Transp. Serv., Inc*., 738 F.Supp. 214, 217 (E.D. Mich. 1990).

sexually assaulted. (Doc. No. 45-1, PageID# 157–58, ¶¶ 3, 4, 5, 6.) Additionally, Chalk states that he had nothing to do with the decision to transfer King to TTCC. (*Id.* at PageID# 15, ¶ 8.) King offers no evidence to rebut Chalk's statements. Instead, King states that Chalk "took recorded statements from [him] and Chris Gordon," "placed [him] and Mr. Gordon on segregation and told them both that he would come and talk to them later," and told King "if [he] remembered anything more to contact him (Mr. Chalk)." (Doc. No. 51, PageID# 220, ¶ 10.)

King's statements are not inconsistent with Chalk's declaration. While Chalk states that he does not remember King, Chalk reasonably would have spoken with King in connection with his job, which required him to "evaluate inmates who make any allegation that they have been sexually assaulted or abused in order to determine whether they need any continuing mental health treatment." (Doc. No. 45-1, PageID# 157, ¶ 4.) King points to no evidence in the record to show that Chalk participated in the PREA investigation. King does not state or point to any evidence to show that Chalk was taking a recorded statement in connection with the PREA investigation, and Bryant confirmed that Chalk did not participate in the PREA investigation. (Doc. No. 45-3, PageID# 167, ¶ 15.) Moreover, even if King intended to claim that Chalk knew about King's allegations but failed to protect him from Gordon, there is no evidence that Chalk disregarded that risk. *Richko*, 819 F.3d at 916. According to King, it was Chalk who placed him in segregation (Doc. No. 51, PageID# 220, ¶ 10), thus protecting King from any further contact with Gordon while King was housed at SCCF.

### 3. Defendant Wilkes

King's claim against Wilkes is that Wilkes failed to protect King when Wilkes allowed Gordon to come into the pod where King was housed. (Doc. No. 1, PageID# 6; Doc. No. 6, PageID# 29.) King states by interrogatory answer that he told Wilkes "around 7:45 a.m. – 8:00

a.m." that Gordon "posed a risk of bodily harm to [him]." (Doc. No. 72-4, PageID# 395.) King

claims that he was first assaulted at 9:00 a.m. that day. (Doc. No. 72-3, PageID# 386, ¶ 18.) But

there is simply no evidence in the record to support King's claim that Wilkes gave Gordon access

to his cell or was otherwise deliberately indifferent to King's safety. *See Farmer*, 511 U.S. at 837.

Summary judgment is appropriate for all three defendants based on the merits of King's

claims.

### C.  King's Motion for Summary Judgment

In connection with his response to the motion of James and Chalk, King filed a motion for

summary judgment arguing that all of the individuals who filed declarations in support of James

and Chalk's motion are lying because Chalk did participate in the investigation into King's PREA

complaint. (Doc. No. 50.) King filed a statement of facts in support of his motion. (Doc. No. 52.)

King also submitted five exhibits: (1) a grievance from December 29, 2015 regarding commissary

items that he did not receive (Doc. No. 52, PageID# 244); (2) a TDOC "Response of Supervisor

of Grieved Employee or Department" form which states that Chalk signed for King's commissary

items and that there is no record that anything was missing (*id.* at PageID# 245); (3) an incident

statement that reflects that case manager Cook brought King's commissary items to Chalk's office

where they were secured and noting that all items appeared to be "in the bag" (*id.* at PageID# 246);

(4) an incident statement signed by Chalk noting that Chalk delivered two cases of ramen noodles

to King (*id.* at PageID# 247); and (5) an email message originally from defendants' counsel to

Christie Simmons at CoreCivic which was forwarded to Staggs seeking the signatures of declarants

who provided evidence in support of the motion for summary judgment filed by Chalk and James

(*id.* at PageID# 248). Defendants' filed a response to Plaintiff's motion and his statement of facts.

(Doc. Nos. 55, 56.)

It is, frankly, unclear what the relationship is between King's statement of facts and the claims he has alleged in this action. Regardless, to the extent that King's statement asserts facts that were not already raised by Defendants, they are as follows: (1) Defendants failed to identify the chief investigator who conducted the PREA investigation (Doc. No. 56, PageID# 263, ¶ 3); (2) Cook signed for King's commissary and took it to Chalk's office (*id.* at PageID# 264, ¶ 9); (3) Chalk told Cook to put King's commissary items in Chalk's office (*id.* at PageID# 265, ¶ 10); (4) Chalk gave King his commissary (*id.* at ¶ 12); (5) King made a statement during the PREA investigation "regarding [e]xtortion of his commissary items (*id.* at PageID# 266, ¶ 16); and (6) Chalk accepted and stored evidence in his office that pertained to the PREA investigation (*id.* at PageID# 270, ¶ 35.) Although unclear, King apparently intends to establish that Chalk's involvement with his commissary items demonstrates that Chalk was also involved in the PREA investigation, and demonstrates that Chalk's declaration in which he states that he was not involved in the PREA investigation is false.

King bears the ultimate burden of proof at trial on the Eighth Amendment claims he raised in his complaint. Thus, to be entitled to summary judgment, he must present evidence that establishes each element of his claims for relief. He has not done so. The evidence that King offers with his motion has nothing to do with his claims that the defendants were deliberately indifferent to his safety. King's motion does not establish any elements of his Eighth Amendment claim against Chalk, or any of the other defendants. It must, therefore, be denied.

## III.    Conclusion

For the foregoing reasons, the undersigned RECOMMENDS that the defendants' motions for summary judgment (Doc. Nos. 45, 72) be GRANTED, that King's motion for summary

judgment (Doc. No. 50) be DENIED, and that all other pending motions (Doc. Nos. 58, 66, 68, 77, 78, 79, 89) be DENIED AS MOOT.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 11th day of September, 2018.



ALISTAIR E. NEWBERN
United States Magistrate Judge